**Pages 1 - 39**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

23ANDME, INC.,                    )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )     **NO. C 18-02791 EMC**
                                  )
ANCESTRY.COM DNA LLC;             )
ANCESTRY.COM OPERATIONS, INC.;    )
ANCESTRY.COM LLC,                 )
                                  )
          Defendants.             )
                                  )

                         San Francisco, California
                         Thursday, August 16, 2018

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    McDERMOTT, WILL & EMERY LLP
                    275 Middlefield Road - Suite 100
                    Menlo Park, California  94025
              BY:   **WILLIAM G. GAEDE III, ATTORNEY AT LAW**
                    **BHANU K. SADASIVAN, ATTORNEY AT LAW**
                    **SAMI SEDGHANI, ATTORNEY AT LAW**

For Defendants:
                    WILMER, CUTLER, PICKERING, HALE
                      & DORR LLP
                    950 Page Mill Road
                    Palo Alto, California  94304
              BY:   **MARK D. SELWYN, ATTORNEY AT LAW**
                    **THOMAS G. SPANKLING, ATTORNEY AT LAW**

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:  (CONTINUED)

For Defendants:

WILMER, CUTLER, PICKERING, HALE
  & DORR LLP
1875 Pennsylvania Ave., NW
Washington, D.C.  20006
BY:  **BRITTANY AMADI, ATTORNEY AT LAW**

WILMER, CUTLER, PICKERING, HALE
  & DORR LLP
350 S. Grand Avenue - Suite 2100
Los Angeles, California  90071
BY:  **DAVID C. MARCUS, ATTORNEY AT LAW**

**Thursday - August 16, 2018**                                    **2:37 P.m.**

                              **P R O C E E D I N G S**

                                  ---oOo---

          **THE CLERK:**  Calling Civil Action 18-2791, 23andMe, Inc., versus Ancestry.com DNA LLC, et al.

     Counsel, please approach the podium and state your appearances for the record.

          **MR. SELWYN:**  Good afternoon, Your Honor.  Mark Selwyn on behalf of Ancestry.  With me today is Brittany Amadi, David Marcus, and Thomas Sprankling.

          **THE COURT:**  All right.  Thank you.

          **MR. GAEDE:**  Good afternoon, Your Honor.  Bill Gaede with McDermott, Will & Emery representing the plaintiff 23andMe.  With me are my colleagues Bhanu Sadasivan and Sam Sedghani.

          **THE COURT:**  All right.  Welcome everyone.  Thank you.

     So let's address the 101 question first.  This is, as we all would acknowledge, a bit of a muddy area of the law here.

     As to the directed-to component, why is this not directed to sort of law of nature?  I mean, you know, given the subject matter of this and the scientific theory that underlies this, why isn't this, at least under the first prong, a directed to of nature?

          **MR. GAEDE:**  Sure.  I think I'll take that one.

     Your Honor, for a number of different reasons.  First of

all, it's not really directed to a law of nature.  As the
defendants have argued and they've raised, for example, like
the *In Re BRCA1* case, which I'm happy to talk about, that
really involves an abstract principle.  And so the issue here
is it's an application that does have, of course, some abstract
principles in it, but an application does not mean that a claim
is not patent eligible.  In other words, the fact that there is
some abstract principle in a claim does not mean that the claim
is directed to that abstract principle.

And the claim in no way says, for example, "Compare two
DNA sequences and find a relative."  That, arguably, could be.
But, instead, it's a very specific claim that is directed to a
relative-finder system, as the title of the patent says, and it
uses a specific series of steps and processes for one relative
out of a massive genealogical data -- i.e., gene information of
a specific type -- to find and then to locate and to notify
that other relative of the specific relationship.

Now, that kind of claim is on all fours with, for example,
the *Rapid Litigation* claim, the *Thales* or *Thales* claim -- I've
heard it said both ways -- the *Thales* case.  It's also on all
fours with the *Diehr* case from the Supreme Court, and also with
the *Enfish* case.

And the fact that I think this is also important, that the
fact that -- and let me read to you one quote from the *Enfish*
case, and this is at 822 Fed. 3d 1327-1339, quote, (reading):

"Similarly, the improvement is not defined by reference to physical components.  It does not doom the claims.  To hold otherwise risks resurrecting a bright-line machine or transformation test."

And the *Alice* case makes very clear that technological improvements are patentable subject matter.  So what we have here is an improvement in the genealogical arts of one relative being able to find another relative and determining their relative relatedness to each other.

THE COURT:  And how would you summarize that improvement that takes it out of that orbit?

MR. GAEDE:  Oh, absolutely.  It's all the steps of the claim, Your Honor.  We have to look at all of the steps of the claims that are at issue, and I'd be happy to walk Your Honor through that improvement, but let me try to say it at a higher level.

More specifically what it is is with the DNA recombinable information, which is different than, for example, the prior art, which taught Y gene and also mitochondrial DNA as reflected in the patent itself.  And, as the patent itself in there says, that any of the techniques that are used in the claims are routine, then what are the steps?

As it says, first, you have to create the database.  You have to obtain the recombinable DNA information, which is different than the prior art mitochondrial and Y chromosome

DNA.

You have to then go through a series of steps of analysis of identifying and then calculating certain DNA information within that person's particular recombinable DNA.

So, as for example, we talk about in dependent Claim 7, not only do you identify IBD, but you also then have to go through the calculation step of adding the segments of IBD in total or determining the percentage.

And from that, then, you then identify the relative relatedness.  And "relative" means that, for example, Your Honor, I guess it's possible you could be my fifth cousin or seventh cousin.  I don't know.

**THE COURT:**  I'd have to recuse myself from this case then.

**MR. GAEDE:**  I guess at some level we're all related.

But the point being that it's also not just a simple calculation.  In other words, the fact that your mother may have a certain percentage of DNA the same as you, your aunt might have the same; and so what it is is by using the specific techniques that are in the claims and each independent -- dependent claim they have not specifically addressed, and we have specifically pled in our complaint that these are not abstract ideas laws of nature but are applications.

And they are applications when you look at it because it's an improvement in the genealogical arts of a relative to find

another relative.  For example, in the old days, back in the 1920s, you might have to go to the Mormon church in Utah.  They have excellent genealogical records and help to find one that way.  There are other ways.  And, of course, as the patent says in the prior art, there is the Y chromosome and then there is also the mitochondrial approach.

But this specific approach here uses the recombinable, and it doesn't stop there, Your Honor.  It goes much more narrowly and into identifying the IBD and then doing calculations, and then also with other claims finding the estimations.

**THE COURT:**  Are those calculations --

**MR. GAEDE:**  Yes.

**THE COURT:**  -- I mean, at the end of the day, a discovery of science or is there some art to this calculation?

**MR. GAEDE:**  It's a new and inventive technique for identifying a relative through the database.  So, yes, there is a calculation.  You have to sum IBD.  Summing, of course, is something that's been around forever, but it's a specific application.

And in that way it's like in the *Diehr* case where they had the Arrhenius equation and there they applied the Arrhenius equation.  Just like here we're summing or we're figuring out a percentage, and that is an application of a mathematical process.

**THE COURT:**  Now, that percentage, how is that

percentage determined?

**MR. GAEDE:**  That percentage is determined by, first, identifying the IBD, which is not trivial; secondly, you then determine what percentage is shared between the two; and that in part informs your analysis of the relative relatedness, whether it's a first cousin, a second cousin.

And then to complete the process --

**THE COURT:**  And how is that determined?  How is that determined?  What is sufficient?  What is a sufficient share?

**MR. GAEDE:**  It depends upon the level of relatedness.

**THE COURT:**  And is that -- but is that percentage based on really a scientific discovery or is it based on something added by humans?

**MR. GAEDE:**  So the process of going through and identifying the IBDs and then calculating the percentage and then also in the alternative calculating the lengths of the IBD and summing those, that's a process by humans.

**THE COURT:**  But is it not based on some scientific law or principle that's already existent out there?

**MR. GAEDE:**  No, Your Honor.  The actual principle out there that there was IBD, that was out there; but the principle of how to identify relative relatedness through this particular process and of also summing and determining the percentage, that was not out there.  That was new and that, as pled in our complaint, is new.

**THE COURT:**  So, I mean, just to take a basic principle like in *Mayo*, where, you know, maybe it takes some effort to figure out what the right correlation is, et cetera, et cetera. I mean, just because it wasn't obvious in the first instance, it took some digging, it took some work to figure out whether it's correlation or whether it's some kind of percentage or calculation that works, at what point does it rise above a level to get out of 101?

**MR. GAEDE:**  So let me -- I think that's an excellent example because the *Vanda* case, that is cited in our papers two days ago or yesterday the Federal Circuit just denied the *en banc* petition.  And in the *Vanda* case, the facts of the claim are very markedly similar to what is in *Mayo*, and the court found that there it was an application in that it was a method of treatment.  Just like here what we have is a specific system of process for finding a relative through this particular system.

So *Vanda* is on all fours and the Federal Circuit, as of yesterday or the day before, just denied the petition *en banc* without one dissenting vote finding that that was different than what was in *Mayo*, and I'd urge the Court to read that case, which is cited in our papers.

**THE COURT:**  All right.  You've been wanting to say a few words.

**MR. SELWYN:**  Thank you, Your Honor.

**THE COURT:** So you might start off with this last comment here on *Vanda*.

**MR. SELWYN:** And I would like, Your Honor, first, to focus on the question that you asked, which relates to the law of nature.

And I think what Mr. Gaede just told you confirms that everything about this patent in fact relates to a law of nature, specifically people who share similar DNA are related to one another. And the claims unquestionably relate to that.

Every claim covers, quote, "a relative relationship of people who share a common ancestor based upon similarities in their DNA sequence." The patent specification, while it is very brief, is essentially an extended discussion of these laws of nature, including characteristics of DNA among relatives, such as at the IBD regions that Mr. Gaede just mentioned, variance among markers, among genome sequences, in examples of such markers, and relationship patterns among different population groups such as Ashkenazi Jews. Those are all national phenomenon, those are characteristics of the human genome that the claims rely upon.

So in the first step of *Alice*, first it fails because it claims a law of nature; but as our brief points out, it also fails because it claims an abstract idea, that abstract idea being collecting DNA, comparing that DNA using known genetic principles and known natural phenomena, such as IBD regions,

and then determining a relationship between those two people.

And, Your Honor, I think it's important in assessing this question of patent eligibility to look at what the claimed invention is not.  The patent doesn't claim any new device, any new technical solution, any new laboratory technique for collecting and analyzing DNA samples or detecting a relationship between DNA samples.

The patent doesn't claim any new device, new tech --

**THE COURT:**  Well, what about the detection part? Isn't that part of the -- you know, especially diving deeper now and finding relationships sufficient to -- I mean, there is some calculation there, isn't there?

**MR. SELWYN:**  No.  But all that is, Your Honor, is a narrowing of the abstract concept; the abstract concept being people who have common DNA are related to one another.  What the dependent claims do is look at innate characteristics of the human genome as inputs for that determination.

So when 23andMe says, "Well, this really claims a superior technique, a more detailed technique," all it is is a narrowing of the abstract concept.  What 23andMe is labeling as an advanced technique is the abstract idea, is the law of nature.

**THE COURT:**  Well, wouldn't that be true, though, of any -- I mean, anything that you say that has to do with any kind of scientific discovery and whether it's, you know, some kind of medical treatment or anything else?  I mean, you could

always say, "Well, it's all really about narrowing the parameters of science, that science has already provided or focusing on certain regions"; and, yet, it seems like at some point there's enough inventive concept here -- and I realize that's the second step -- that allows something to be patentable under 101.

MR. SELWYN:  Well, that's right.  That does take us to the second step of looking at what is it in the claim that adds something beyond the law of nature, and here there is nothing. There is no new equipment.  There is no specialized computer. There is no new algorithm.  There is no statistical technique.

To Your Honor's question of, well, what do you do with this information, how do you make these predictions, these determinations of the degree of relatedness, the claims don't tell us that.  That's not covered within the claims.

There's nothing within the claims that describes a transformation of a known natural phenomenon.  There's nothing in the claims that talks about a device that's specialized to perform it.  So that distinguishes this case from the facts that were at issue, for example, in the *CellzDirect* case.  That was the case that involves a cryptographic preservation technique to preserve liver cells for later use, and that's essentially the primary case that 23andMe is relying upon on the law-of-nature point.

The claims that were at issue in *CellzDirect* were directed

to a laboratory technique for preserving a certain type of cell. So you had in that a new device, a new technique for taking a natural phenomenon and transforming it, and the Federal Circuit was very focused on that issue of transformation.

And if you look at that decision, there is a fairly extensive discussion that begins 827 F.3d 1048 that distinguishes the facts in *CellzDirect* from the cases, like, *Genetic Technologies* and *BRCA* that Ancestry is relying upon and explains why when you are merely comparing two DNA sequences, which is exactly what these claims cover, that that is both abstract and relying upon a law of nature. In contrast to the situation in the *CellzDirect* case, where it was taking a natural phenomenon and transforming it in a way that was patentable. And there's a lengthy articulation in that case of the distinction between the two.

So when you look at the issue of inventive concept, you have to look at what was added. Is there really something more here than just a generic computer? And there isn't.

Another clue for that is if you look at the file history -- and this is in my declaration Tab 1 -- there was a rejection, a fairly lengthy one, on 101 grounds. And the response to that rejection was not to say, "Patent Examiner, you're wrong about all of that, you're wrong about your analysis of prong one and prong two." No, all they did in

response to that is amended the claims in two ways:  For Claim 1, the applicants added "one or more computer processors," full stop.  For Claim 27, they added the word "tangible" before "computer readable storage medium."  That was the only change that was made in response to that 101 rejection.

So this is a case where the patent fails both *Alice* Step 1 for law of nature and for being abstract and fails too for prong two for lack of inventive concept.

And as long as we're talking about new Federal Circuit decisions, Your Honor, I would direct Your Honor to --

THE COURT:  Well, why don't you respond to the *Vanda*, his note that there's just a rejection of *en banc* rehearing.

MR. SELWYN:  Yet that doesn't change any of this.  I mean, this patent still is resting upon a law of nature that people who share similar DNA are related, and that you look at certain aspects of the human genome to make that determination.  You collect data, you compare and analyze that data, and you report it back to the users.  That's it.

The inputs for that calculation are inherent genetic characteristics of everybody.  The claims don't have any special techniques for how you process that.  They don't have any special equipment for doing the processing either.

MR. GAEDE:  Your Honor, let me just a couple comments in rebuttal here.

**THE COURT:** Yeah.

**MR. GAEDE:** Special techniques, there's specific elements in the claims of techniques that are used in terms of adding and/or figuring out percentages that takes this information in that relatives have common DNA and transform it by looking at only certain portions of the DNA, looking at the lengths of the DNA, looking at certain similarities in the information; and from that, then, providing an output and a notification to the other relative that they are related.

Now, that does not rest -- that is not a claim that is directed to a law of nature. And I direct Your Honor's attention to the *Thales* case.

**THE COURT:** But isn't that different from coming up with a process to deal with cells in a certain way? I mean, there's nothing -- your technique is, in a sense, just zeroing in on certain aspects and regions of DNA, making certain comparisons, coming up with, you know, I guess some kind of calculation or judgment as to at what point do you determine that that is sufficient, but it's still dealing with nature and discerning from nature certain relationships based on a basic law of nature. What is inventive? What is transformative here? I don't --

**MR. GAEDE:** We're not just comparing DNA sequences, Your Honor. What it is is a system using the specialized techniques that are identified and through that system then

being able to identify a relative and be able to find another relative.

And I direct Your Honor's attention to the *Thales* case, and I think it's very clear on this point.  They say (reading):

"At Step 1, it is not enough to merely identify a patent-ineligible concept underlying the claim.  We must determine whether that patent-ineligible concept is what the claim is directed to."

And the claim is directed here to a system for a relative to find another relative using the specific techniques that are in the claim.

In the *Thales* case at 1349 it goes on to say (reading):

"Just as a natural law can be utilized to create an improved laboratory technique for preserving liver cells, so can the application of physics create an improved technique for measuring movement of an object on a moving platform.  Just as claims directed to a new and useful technique for defining a database that runs on a general purpose computer equipment are patent eligible, so too are claims directed to a new and useful technique for using sensors directed to a new and" -- "to more efficiently track an object on a moving platform.  That a mathematical equation is required to complete the claim method and system does not doom the claims to abstraction."

And it goes on in the *Thales* case (reading):

"All it was is the claims specify a particular configuration of inertial sensors and a particular method of using the raw data from the sensors in order to more accurately calculate the position and orientation of an object on a moving platform."

And here, that's exactly what we're doing.  We're providing a new-and-improved technique, which *Alice* deems patent eligible, advances the technology, a way to more specifically find that relative that previous techniques could not disclose as reflected in the background of the patent before this court, that the Y DNA and the mitochondrial DNA was insufficient.  And in no way does it preempt the field of finding a relative, of use of gene information, of even finding a relative relatedness.  There are a myriad of ways to get around this.

THE COURT:  Why wouldn't -- I'm just thinking more globally here.  If the science were such that you knew something about some phenomenon, some object, whether it's examining a cell or examining fingerprints or whatever it is, and you discover that there are other regions or with higher magnification you can see other kind of qualities that you didn't previously see before --

MR. GAEDE:  Yeah.

THE COURT:  -- through the use of a better microscope or spectrometer or something, and now you can drill down better

and make that calculation, for instance a diagnosis of cancer. Before you looked at certain gross, you know, things at a certain level, and now you've discovered that there's a particular enzyme marker now that -- through science, I mean nothing you invented, but now you've discovered that, that that enzyme is a pretty good indicator of a cancer cell; or some other indicator, whether it's microscopically, whether it's through blood tests.  Is the mere discovery of that, is that patentable; you've discovered a new region, a new aspect, drilling down deeper to solve the same problem but now you can do it much better?

**MR. GAEDE:**  Let me give you, I think, the answer to your question that comes from the U.S. Supreme Court in the 2013 *Myriad* decision.  That was to a gene, the BRCA1 and 2 gene, and it said that the DNA sequence itself was not patentable.  But in that decision they say *Myriad* was in an excellent position to identify new applications of that gene, and that they acknowledged that those new methods and new applications could be potentially patent eligible.

And that's what you see in the last series of cases by the Federal Circuit in the *Thales* case, in the *Enfish* case, in the *Vanda* case, going all the way back to *Diehr*, a new technique for vulcanizing rubber where we just have a temperature.  We're still using the Arrhenius equation, but that was patent eligible by the Supreme Court.  And as *Thales* recognizes, that

is directed to Step 1.  *Diehr* is directed to Step 1.

And even though at that point in time the Supreme Court hadn't defined *Alice* in 2014 with Step 1, it makes the statement that *Diehr* is related to that.

So my only -- my point is is that the fact that some abstract principle may be used in a claim doesn't mean that the claim suffers.  And the Federal Circuit is, of course, clear on that in all the recent decisions that we've identified in which the question is:  Is it directed?

And as *Thales* tells us, even in claims involving physics and mathematical equations, that does not mean that the claim is patent ineligible.  And as the Supreme Court warned in the *Myriad* case, simply because the DNA sequence itself is not patent eligible, new applications of it are, and we have alleged that this is a new and specific application that allows relatives to find each other through this database and be identified with each other.

In that way, it's no different than the *Vanda* case where it's just a method-of-treatment claim that the Federal Circuit recently upheld as patent eligible because it satisfied -- it did not satisfy Step 1; in other words, it was deemed to be patent eligible.  We never got to Step 2.

**MR. SELWYN:**  Your Honor, the only --

**THE COURT:**  All right.  Your comment.

**MR. SELWYN:**  The only technique here, and it's not

specialized, is comparing two things:  Comparing IBD data of two different --

THE COURT:  But it's new two things.  It's new things.

MR. SELWYN:  No, it's not.  There's no claim here --

THE COURT:  Well, things that hadn't been compared before.

MR. SELWYN:  But comparison is old.  The things that are being compared are old.  Summing obviously is old.  So the analysis looks to what it is that you are doing the comparison of.

Just two weeks ago in the *SAP* decision, we saw that affirmed again by the Federal Circuit where they wrote (reading):

"Selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis is all abstract."

That is what is happening in these claims.  They are taking known natural phenomena and comparing them.  How are they comparing them?  With generalized, off-the-shelf computer equipment.  There is no specialized technique here whatsoever.  There is no specialized algorithm here whatsoever.  The most specific the claims come in terms of an algorithm is summing, is adding two things together, and there's no particular equipment for doing that?

THE COURT:  So what would be sufficient?  What's an

example of something that is in nature and essentially you're making a discovery of something that had not been previously discovered in science or in nature and making use of that?

It would seem like under your argument, you could never satisfy 101 unless you employed some new, you know, device that actually transformed something or did something different to it. Any discovery of nature or finding, you know, correlations, going through calculations and applying new algorithms to that, coming up with something, would all still be just math applied to something in nature.

MR. SELWYN: That's -- let me answer it in two ways. First, if all you are doing is comparing and analyzing two gene sequences, that is clearly abstract. That's the *BRCA1* case. That is its holding.

In addition, if all you are doing is taking -- if the claim is just directed to correlations between naturally occurring linkages in DNA, which is what these claims are directed to, that is a law of nature. That is the *Genetic Technologies* case.

Now, if you were to take those principles and transform them in some way using some novel device, some new equipment, some new arrangement of components, then at least conceivably you could muster an argument for prong two of *Alice*.

That is not this situation because the claims --

THE COURT: You're saying that absent some employment

of some device, some manipulative or transformative or device that changes things, I mean, are you saying you could never sort of through discovery come up with something that complies -- is patentable under 101?

MR. SELWYN:  Well, we're dealing with the claims that are before us; but, yes, what the cases look to is whether there is something transformative that is done to the law of nature, whether there is some new equipment that has been added to the law of nature.

THE COURT:  I guess my question is:  Can you ever have something that kind of discovers the law of nature in a new way, discovers a new relationship to get a certain result, a thing that wasn't known and maybe going through several steps and applying, perhaps, complex relationships or algorithms or something?  And that could never be so long as you don't use a device that changes things or does something different to it?

MR. SELWYN:  If you are merely discovering relationships that exist in nature or, as in this case, in DNA in the human genome, then, no, that is not discoverable.  No matter how groundbreaking that may be, the cases tell us that does not pass *Alice*.  A new abstract idea is still an abstract idea.

So to answer your question, if you are discovering something new in nature, something new in a genetic makeup, that is in itself not going to pass *Alice* Step 1.

**THE COURT:** All right.  What's your strongest case where there's not been some modifications, some device used, but really could be described as sort of new discoveries and then application of those discoveries without doing something, you know, particularly new?

**MR. GAEDE:** Sure.  I'd direct the Court to the *Vanda* case.  I'd direct the Court to the *Thales* or *Thales* case.  I'd direct the Court to the *Enfish* case.  I'd direct the Court to the *Diehr* case.  And also I think it's just important if you go look at *BRCA1* because I'm intimately familiar with that case. It says here in *BRCA1* at 763 to 764 (reading):

"The methods directed identifications altering the gene require merely comparing the patient's gene with the Y type and identifying differences.  The number of covered comparisons is unlimited.  The covered comparisons are not restricted by the purpose of the comparison or the alteration being detected.  Because of its breadth, the comparison step covers detection of yet undiscovered alterations as well as comparisons for purposes other than the detection of cancer."

Here, by contrast -- so *BRCA1* being very broad -- here, by contrast, you have a very narrow system that is being used by relatives to find another relative using the genealogical -- the gene information, that information that relatives have common DNA; and then calculation transforms it by taking only

certain portions of the DNA and looking at the lengths of the DNA or the percentage, and from that making a determination and a calculation as to the degree of relative relatedness -- i.e., a first or second cousin -- and then notifying that other relative of the relationship.  And that is nowhere near the scope of what's in *BRCA1* and *2* --

THE COURT:  This avoids the, quote, "impeding a great" -- "the risk of impeding a great swath of research related to the genes," which was one of the concerns?

MR. GAEDE:  Absolutely.  You can compare the genes for any other purpose.  You can compare the same gene information in a different way, Your Honor.  You can use it for drug discovery.  You can use it for diagnostics.  You can even take an IBD and use it in a different way, other than what we discovered and what we invented, as a way to process it in such a way that two relatives could find it.  It's a very narrow claim and doesn't even come close to preempting.

MR. SELWYN:  So, Your Honor --

THE COURT:  I'll give you a last word on that.

MR. SELWYN:  Sure.

When he refers to cases like *Thales* and *Vanda*, and so forth, those are cases that involved application of a technological principle to a device.  So in *Diehr*, for example, you had an abstract concept, a mathematical equation, that was integrated into a broader process to solve a technological

problem.  And the invention there was the use of a thermocoupled device to record temperature measurements inside a rubber mold and then the calculation of remaining cure time.

So the invention was not merely implementation on a computer as here, but the transformation of a process of curing rubber by use of this device, a thermocouple.

Here, the '554 patent seeks to claim just the abstract concept itself without anything, any novel machine, any novel components, to achieve a transformation as in the cases that 23andMe is relying on.

**THE COURT:**  Wasn't the inventive -- the thing that was valuable in *Diehr*, didn't that lay in finding that right mathematical equation to get that right temperature, the curing temperature?

**MR. SELWYN:**  It was the use of a known mathematical equation.  There wasn't a claim that the mathematical equation was created by the applicant.

**THE COURT:**  Right.

**MR. SELWYN:**  But it was used in a way with this device that had never been done before.  So the claim involved a thermocouple used in a way that had never been done before.

**THE COURT:**  Well, that's just to implement the find, it seems to me.

**MR. SELWYN:**  No.  Because in the claims that are at issue here, there is no such analog.  All you have is a

comparison.

THE COURT: I'm just wondering how significant was the fact that a thermocouple device was used to implement what was valuable, what the teaching was?

MR. SELWYN: It was very important to the decision. It was the thing that allowed the curing of a rubber in a way that had not been done conventionally.

THE COURT: So you're saying if it had specified through mathematical calculations what that temperature had to be, what the ideal temperature was, et cetera, and didn't involve an actual use of a thermocoupled device, that would have been in trouble under 101?

MR. SELWYN: It would have. Because in *Diehr* you had the actual transformation of the process of curing rubber by virtue of the use of this specialized device, a thermocouple. There's nothing akin to that in the claims here, which involve taking DNA data of two people, comparing them in whatever way you want to compare them -- the claim doesn't say other than the one instance of summing -- and then notifying the users of the result.

MR. GAEDE: Just very briefly, Your Honor.

THE COURT: Yeah.

MR. GAEDE: In the *Thales* decision at 1347 and 1348 where it discusses *Diehr*, it says -- "it," the Supreme Court, explained that (reading):

"Claims are patent eligible under Section 101 when a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect.  In terms of the modern-day *Alice* test, the *Diehr* claims were directed to an improvement in the rubber-curing process, not a mathematical formula."

Likewise, here, the claims are directed to an improvement in new technology for two relatives to find and identify each other and have the relative relatedness as to whether they're a first cousin, second cousin, mother, third cousin, et cetera, using the specialized techniques that are in the claims before the Court.  And as I earlier stated, in no way does this in any way preempt the use of genealogical information in general.

MR. SELWYN:  So if you look at *Thales*, what was at issue there was what the Court said was the unconventional configuration of sensors, and I'm quoting at page 850 F.3d 1349.  So they said what made the invention patentable was not the equations but the use of them as applied to this unconventional configuration of sensors.

Here, the asserted claims only involve a law of nature and abstract idea without any improvement to existing technology or anything physical as in *Thales*.

THE COURT:  Well, but the argument here, this is

directed to a specific process.  It's not trying to patent, you know, the entire field of DNA sequencing but it is looking at a specific process with a specific purpose in mind, and that is determining the degree of kinship or whatever; and, therefore, it is a more narrow and more circumscribed purpose, which would suggest that it has less of the risks and the evils of allowing a patent to go forward of preempting a wide swath of research, et cetera, et cetera.

MR. SELWYN:  But it's not because all you are doing is taking DNA of two people and comparing it without any specialized technique, any specialized equipment.

MR. GAEDE:  Your Honor, shall we move on to Step 2?

THE COURT:  Briefly.

MR. GAEDE:  Okay.  First, all the arguments on Step 1 and Step 2 has just been attorney argument as compared to the well-pled allegations in our complaint at paragraphs 17 to 21, which talk about the application, why it's not directed to abstract principles, the claim, and why this also contains an inventive concept.

So there are clearly a number of factual disputes around the second prong.  And, of course, the Court is aware of the *Berkheimer* case that recently came out from the Federal Circuit in which the issue of a factual dispute can preclude obviously defendants' Rule 12(b)(6) motion, and it should.

So, first of all, there's no evidence in the record, not

in the patent, that summing the length of the IBD regions or recombinable DNA was ever routinely used to predict Ancestry relationships.  In fact, the background of the patent teaches exactly to the contrary, and that's the record that the Court has to rely upon for purposes of the 12(b)(6).  Any argument to the contrary is simply attorney argument and carries no weight.

Also, there's no evidence that using opposite homozygous calls, which are in Claim 12, to estimate IBD regions was ever used, let alone routine and known.

And there's no evidence that any of these techniques were well known to distinguish between, for example, aunts and grandparents, which share roughly the same amount of DNA.

And so they make the argument, which is just attorney argument unsupported, you can do this on a pencil and paper. There's no evidence to that effect, and the allegations in the complaint are directly to the contrary as supported by the specification itself, which doesn't describe any of the techniques as routine.

So, for example, Your Honor, in the case -- I forget the name, but the one that came out today by the Federal Circuit -- the database that was described there was well known before the patent and the technique was well known before the patent.  In, for example, the *In Re BRCA1* and *2* case, the techniques -- oh, I'm sorry.  It's *BSG versus BuySeasons* came out today or yesterday.

And then, secondly, for example, in *BRCA1*, the notion of how you sequence DNA, the notion of how you amplify DNA, which is make more to use the terms, that was well known and in the art.  And, for example, the *Genetic Technologies* case, even in the specification itself it says that these were well-understood routine; and they were because the notion of how to do PCR, make more DNA, and to sequence more DNA was invented back in 1985 and sequencing was invented back in 1977.

So there wasn't any issue around whether the technique of amplifying or sequencing DNA was new and inventive in the *BRCA* claims because they weren't.  Because they'd been existing for many, many years.

And the patent specification conceded that point because it pointed to the prior sequencing law and publications, and it pointed as well to the prior publications around amplifying, making more DNA.

None of that is in the specification.  They say these techniques are routine but, Your Honor, the specification doesn't say that and the complaint doesn't say that.

And simply because the defendants say it's so, doesn't make it so.  And, in fact, we will prove at trial that it is not so.

And, of course, as Your Honor is also aware, in the *Berkheimer* case, it's not a question of whether there might be a piece of prior art; it's a question of whether it's routine

in the art, not just there might be a piece of prior art that teaches that.

So if you look at the cases that they cite -- the *In Re BRCA*, the *Roche Molecular Systems*, the *Genetics Technologies* case -- all of those cases rest upon the simple proposition that how to sequence and how to make more DNA was known, and those are the elements of the claim.

That is not the case here, and the patents in those cases acknowledge that fact, and that is not the case here.  So there's clearly a factual issue that precludes the motion to dismiss on Claim 1.

**MR. SELWYN:**  Your Honor, there is no factual issue here.  The issue is purely a legal one, which is whether a patent that recites the basic concept of people who are related sharing similar DNA is merely claiming a law of nature or an abstract idea; and several Federal Circuit decisions, as we've discussed, have said that is the case.

*Berkheimer* and *Aatrix* are both clear that they were not casting doubt on the, quote, "many cases that have resolved patent eligibility at the motion-to-dismiss stage."

And, Your Honor, this is a case in contrast to *Berkheimer*. Where in *Berkheimer* the purported improvements were described in the specification at length, you have none of that here. 23andMe has pointed to no part of the specification that purports to describe anything that is inventive.

And Your Honor will note this patent is unusual in that there is no summary of the invention.  You can't tell from the spec what the applicants thought was inventive.

And if you look at the file history, you'll also be scratching your head about what the applicants thought was inventive.

Here, 23andMe has not pleaded any specific facts that describe anything to the claims that amounts to significantly more than the abstract idea or the law of nature itself.

THE COURT:  Well, it's a little bit more than just an abstract.  I mean, it's being more specific about what areas, IBD regions, to look for and what needs to be done, you know, at a level that involves some analysis and some I don't know if you call it technique, but procedural or processing technique.

MR. SELWYN:  Not really, Your Honor.  The specification describes IBD regions.  It describes genetic distances.  It describes DNA distribution patterns and surveys, empirical surveys, about them.  It describes SNP markers.

It doesn't suggest that 23andMe invented any of those. The patent doesn't claim to have invented testing based upon autosomal DNA and X chromosome DNA, or what the patent calls recombinable DNA.  None of that is claimed to be new in the patent.

So if we drill down to what is alleged in the complaint, these five paragraphs that 23andMe says create an issue of

fact, well, paragraphs 21 and 22 are just a recitation of the legal standard for patent eligibility and they conclusorily assert that the asserted claims meet that standard.

There are no facts that are alleged here.  And if you look at 23andMe's opposition --

**THE COURT:**  Well, I mean, it talks about what the claims are directed to, the specificity of the application and identifying relatedness, and it identifies certain steps (reading):

"Identifying one or more IBD regions in which a portion of the recombinable DNA of the first and second user arose from the same DNA sequence of an ancestor.  The predicted degree of relationship depends at least in part upon the DNA sequence information of the IBD region; and amount of DNA sequence information includes the sum of the lengths of the IBD regions, particularly DNA shared in the IBD regions and the greater amount of sequencing information."

**MR. SELWYN:**  So, Your Honor, what you just read, which comes from the complaint, is repeating what the claims themselves say.  So they have not said with any specificity what is the improvement.  They have given a boilerplate recitation of what the legal standard is for patent eligibility, and then they have merely in the following paragraphs restated the claim language and done nothing more.

So unlike *Berkheimer* and *Aatrix* where something in the specification at least offered a clue as to what the inventors thought was new and improved, you don't have that here. You don't have that in the file history here either.

THE COURT: Right. Let me ask Mr. Gaede to respond. What is new and improved then?

MR. GAEDE: This is, with all due respect, Your Honor, unfounded argument.

So, first of all, the patent under detail description, which is a detailed description of the invention, has approximately -- one, two, three, four, five, six, seven, eight -- eight and a half columns of description of what the invention is. So all of that is a description of the invention.

Secondly --

THE COURT: So what is the best -- show me --

MR. GAEDE: Yeah.

THE COURT: Rather than saying eight columns, point me to something that's concrete.

MR. GAEDE: I'm going to focus in right now, Your Honor.

So if you take a look at column 7, for example --

THE COURT: Yes.

MR. GAEDE: -- at line 33, it talks about the number of shared IBD segments and the amount of DNA shared by the two

users are computed based on the IBD.  Then even more importantly showing that it's an application, not directed, it uses the term "in some embodiments," which is what the claims are directed to.  (reading)

"The amount of DNA shared includes the sum of the lengths of the IBD regions and/or percentage of DNA shared."

That's exactly what's in the complaint, and it's exactly right in the patent at column 7, lines 35 to 37.  And you can keep reading on from there, Your Honor.

**THE COURT:**  So what's new and nonroutine about that?

**MR. GAEDE:**  That's the invention, Your Honor, that's described under the section of the detailed description of the invention.  And all of that is new that was not done before under the invention, and that is compared to the background, which is in column 1 in the first two paragraphs there, which describes a completely different technique for identifying relative relatedness.

**MR. SELWYN:**  Your Honor, not only does the specification not claim what he just read is new, but it actually says that it's not new in other places.

If you look at column 2 beginning around line 32, it talks about the science, the natural phenomena, that relate to what is claimed.

And it talks about IBD regions and what they are.  It

talks about locating IBD regions based upon sequencing the entire genome.

And then if you look at column 6, there's a very lengthy discussion of genotyping technology that begins by saying, "The standard SNP-based genotyping technology results in," and it continues for several paragraphs.

THE COURT:  What line is that on?

MR. SELWYN:  Yes.  Column 6, line 14, "The standard SNP based genotyping technology..."

And then it describes for several paragraphs the standard GNP-based genotyping technology.  That standard technology is what can be used to do all of the comparisons that are described in the claims.

So there's absolutely nothing in this patent that describes anything as new.  As I said, this is an unusual patent in that there is no summary of the invention where you would normally look for that.  And what the patent is, in fact, telling us is none of these things are new.  These are natural phenomena that were well known to scientists and they are using them to make a comparison.

THE COURT:  All right.  I'll give you a response, particularly to column 6.

MR. GAEDE:  Yes.  I absolutely disagree.

If you look -- so there is some basics on SNP, but then later on what you see, for example, in Figure 6, which is

referred to how to use the SNP for IBD identification by the process, that's at 7 --

THE COURT:  Where are you looking at?

MR. GAEDE:  -- 17, and it goes on to show a specific technique and way in which using certain SNP information at Figure 6.  And nothing in that paragraph says that that is routine or that that is something that was preexisting.

And, in any event, Your Honor, that's only one element of a dependent claim.  And you have to look at the entire claim and the entire claim language, you have to look at it as a whole.

And so, as we've identified for you here in column 7, it goes on to column 8, and the detailed description of the invention, the entire invention, as pled in the complaint, is clearly described.

MR. SELWYN:  So Figure 6 is another good example of a law of nature.  It's describing in column 7, lines 17 through 32, the natural phenomenon of how you would compare these two gene sequences that are showed schematically on Figure 6.  It tells you nothing about any particular equipment that would be done to do that.  It just says you take these two sets of DNA data and you compare them using IBD information or SNP information or other information.

THE COURT:  Well, isn't the assertion that this patent is directed towards a new analysis, a new technique, in

analyzing this law of nature?

MR. SELWYN:  Well, that may be 23andMe's assertion now, but that's not what the claims say.

THE COURT:  All right.  I'll give you the last chance to respond to that.

MR. GAEDE:  I think, Your Honor, it comes down to a very simple issue.  We've alleged that these are not routine. It's just attorney argument to the contrary.

The patent doesn't say that all the elements of the claim are routine.  In fact, to the contrary compared to other claims that have been struck down by the Federal Circuit.

And it all comes under the detailed description of the invention.  There are eight columns of description of the invention; and, as a whole, which the claim must be looked at as pled, it clearly does not identify routine steps that were well known.  If they had, I'm sure the defendants would have put forward in front of you 20 articles of prior art to take judicial notice of, and they didn't.

MR. SELWYN:  Your Honor, that's a 102-103 argument. We're here for 101.

THE COURT:  All right.  That's the main issue I want to talk about today.  I will take the matter under submission. I understand there's other issues, but this is the most interesting, shall we say, what I wanted to hear from you and I will say with the benefit of your argument.  So thank you.

**MR. GAEDE:**  Thank you, Your Honor.

**MR. SELWYN:**  Thank you, Your Honor.

(Proceedings adjourned at 3:30 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, August 21, 2018

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter